**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**



**WILLIAM R. DAVIS,**

    **Plaintiff,**

**vs.**

**BARRY REDDISH, in his official capacity as the Warden of Florida State Prison, JULIE JONES, in her official capacity as the Secretary, Florida Department of Corrections,**

    **Defendants.**

)
)
)
)
)
)
)
)
)
)
)
)
)
)

**Case No:**
3:18-cv-353-J-34 PDB

**Death Penalty Case**

## COMPLAINT

### I. INTRODUCTION

1. By this Complaint, Plaintiff William R. Davis ("Mr. Davis") challenges the State of Florida's lethal injection protocol adopted on or about January 4, 2017, which uses the drug etomidate as the first drug in a three-drug protocol, followed by a paralytic rocuronium bromide and potassium acetate as the second and third drugs, respectively (hereinafter "Etomidate Protocol"). (Etomidate Protocol and accompanying letter to Governor from Julie Jones, Secretary of the Florida Department of Corrections is attached as Exhibit A).

2. Mr. Davis brings this Complaint pursuant to 42 U.S.C. § 1983 for violations and threatened violations of his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

3. The Etomidate Protocol is unique to Florida. No other state currently executes its death row inmates in the same manner.

4. Over the years, Florida has tweaked and altered its Lethal Injection Policies and Procedures by using novel drug combinations, by obscuring and re-positioning the condemned in ways that conceal the prisoner's substantial and prolonged suffering, and by limiting attorney access and refusing to provide basic accommodations for counsel on the day of the execution.

5. Florida's decision to cling to the increasingly archaic three-drug protocol, coupled with its decision to use an unreliable first drug, violates the evolving standards of decency that mark the progress of a maturing society encompassed in the Eighth Amendment.

6. The Etomidate Protocol, both as written and as carried out poses a substantial risk of serious harm to Plaintiff.

7. Mr. Davis seeks temporary, preliminary and permanent injunctive relief to prevent Defendants from executing him by means of lethal injection as currently performed in Florida. Mr. Davis asks that Defendants be restrained

from carrying out his execution until such time as they have eliminated the substantial risk of serious harm presented by the Etomidate Protocol.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1343 (civil rights violations), 2201 (declaratory relief) and 2202 (injunctive relief). This action arises under the Eighth and Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1983.

9. Venue is proper pursuant to 28 U.S.C. § 1391(b).

10. Mr. Davis is currently incarcerated at Florida State Prison, 23916 NW 83rd Ave, Raiford, FL 32083, located in this district. Mr. Davis has been sentenced to death by means of lethal injection at Florida State Prison, 23916 NW 83rd Ave, Raiford, FL 32083, also located in this district under the direction of Defendant Warden Reddish.

11. In addition to Mr. Davis and Defendant Warden Reddish being located in this district, all executions conducted by the Florida Department of Corrections occur at Florida State Prison, therefore, "a substantial part of the events or omissions giving rise to the claim" will occur in this district. 28 U.S.C. § 1391(b).

12. Declaratory relief is sought pursuant to 28 U.S.C. §§ 2201 and 2202.

13. Temporary, preliminary and permanent injunctive relief is sought pursuant to Rule 65, Federal Rules of Civil Procedure.

## III. PARTIES

14. Mr. Davis is a resident of the State of Florida. He is currently a death-sentenced inmate at Florida State Prison in Raiford, Florida, and is in the custody of Defendant Jones, Secretary, Florida Department of Corrections.

15. Defendant Barry Reddish is the Warden of Florida State Prison. As such, he is responsible for all executions and for the administration of lethal injection for the Florida Department of Corrections. He is sued in his official capacity.

16. Defendant Julie Jones is the Secretary of the Florida Department of Corrections (FDOC). As such, she is responsible for the creation and enforcement of policies and procedures generally applicable to all prisons and all prisoners, including the procedures and protocols related to executions by lethal injection. She is sued in her official capacity.

17. At all times relevant to this action, Defendants acted under color of state law and their actions constituted state action.

## IV. EXHAUSTION OF ADMINISTRATIVE REMEDIES

18. Mr. Davis does not believe that exhaustion of administrative remedies is necessary under the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997(e), because this suit does not challenge prison conditions and there are

no available administrative remedies that could address the challenged constitutional violations inasmuch as (a) Defendants have repeatedly responded to prisoner grievances on this subject by denying any authority to change Florida's lethal injection practices and (b) exhaustion would be futile inasmuch as Defendants have repeatedly stated that the Etomidate Protocol is lawful.

19. However, Mr. Davis exhausted all available administrative remedies in connection with the Etomidate Protocol by no later than May 25, 2017. Attached here as Exhibit B is a true and correct copy of Mr. Davis's grievance documents and Florida's responses thereto.

## V. GENERAL ALLEGATIONS

20. Under Florida law, "[a] death sentence shall be "executed by lethal injection...under the direction of the Secretary of Corrections or the secretary's designee." Fl. Stat. 922.105(1).

21. The capital sentencing statute does not prescribe specific drugs, drug suppliers, dosages, drug combinations or the manner of intravenous line access to be used in the execution process, nor does the statute require any certification, training or licensure of those who participate in the execution process.

22. All of the details of the execution process are to be determined by the Defendant Secretary and are specifically exempt from Florida's Administrative Procedures Act. Fl. Stat. 922.105(7).

23. Defendants intend to execute Mr. Davis pursuant to the Etomidate Protocol.

## A. How the Etomidate Protocol Works.

24. On January 4, 2017, Defendants continued their pattern of unilaterally changing the lethal injection protocol, without advance notice or explanation.

25. The Etomidate Protocol calls for the intravenous injection of the following drugs, in the following order: (i) 200 milligrams of etomidate, (ii) 1000 milligrams of rocuronium bromide and (iii) 240 milliequivalents of potassium acetate.

26. The objective of the first drug, etomidate, is to induce a level of unconsciousness that achieves and maintains a surgical plane of anesthesia, i.e. one that renders a person insensate to the pain of the second and third drugs.

27. The objective of the second drug, rocuronium bromide, is to give the appearance of a serene death. It functions by paralyzing all voluntary muscles, thereby preventing the inmate from manifesting pain. Rocuronium bromide prevents the condemned prisoner from breathing by paralyzing the diaphragm, thereby preventing air from being moved in and out of the lungs.

-6-

28. Rocuronium bromide is not an anesthetic and does not affect consciousness or the perception of pain. A conscious person under the influence of rocuronium bromide would experience the sensation of death by drowning but be unable to indicate this. Thus, Mr. Davis will suffer a lingering and torturous death if he is not fully anesthetized before the rocuronium bromide takes effect.

29. The objective of the third and final drug, potassium acetate, is to kill the prisoner. It does this by inducing cardiac arrest by interfering with the heart's electrical activity.

30. Potassium acetate causes excruciating pain and suffering if administered to a condemned prisoner who is not sufficiently anesthetized. As potassium acetate travels through the bloodstream from the injection site towards the heart, the chemical activates sensory nerve fibers inside the veins, causing a prolonged and intense burning sensation. If an inmate is not adequately anesthetized during the execution procedure, the inmate will suffer torturous pain, but, under the Etomidate Protocol, he will be incapable of expressing his suffering due to the paralytic effect of the rocuronium bromide.

31. Thus, if Mr. Davis is not to suffer, or face a substantial risk of suffering, a prolonged, excruciating pain during his execution, the first drug, etomidate, must (1) achieve a depth of unconsciousness before the second drug is

administered sufficient to render the inmate insensate to the pain of the second and third drugs and (2) maintain that depth until death.

**B. Why etomidate is not an appropriate first drug.**

32. Etomidate is not an appropriate or effective drug to use as the first drug in any three-drug lethal injection procedure because 1) its effects will wear off quickly and likely drop below anesthetic levels before the execution is complete; 2) it causes significant pain upon injection; 3) it has no analgesic properties; 4) its side effects include myoclonus, making assessment of consciousness more difficult and more time consuming; and 5) if it comes into contact with rocuronium bromide in the IV tubing, it will precipitate in, leading to incomplete drug delivery and loss of the IV in the middle of the procedure.

33. Etomidate lacks the basic properties necessary to induce a level of anesthesia that renders the Plaintiff insensate to the pain of the second and third drugs.

34. Etomidate is an ultra-short acting sedative-hypnotic. It displays a pharmacodynamic profile (duration of effects) similar to thiopental and as such poses a substantial risk of wearing off before the execution is complete.

35. While etomidate can induce unconsciousness, it cannot reliably maintain unconsciousness due to its ultra-short acting nature. Etomidate has a re-distribution half-life of 2.7 minutes. In a 17-minute execution (the length of

-8-

time of the most recent etomidate execution of Eric Branch on February 22, 2018), the concentration of etomidate would be far lower than a clinical dose and therefore be insufficient to ensure that Plaintiff will not feel the excruciating pain of the second and third drugs. (Exh. C, Declaration of Dr. David Lubarsky ("Lubarsky Decl."), which is incorporated herein by this reference, at ¶ 16).

36. Etomidate also causes significant pain upon injection in most administrations. Plaintiff will feel this pain at the injection site and will continue to feel it as the entire 200 mg is pushed into his veins or until he loses consciousness. (Exh. C., Lubarsky Decl., at ¶14).

37. The pain caused by etomidate was apparent in the February 22, 2018 execution of Eric Branch, who let out a "blood-curdling" scream "at the top of his lungs" immediately following the administration of etomidate. (Exh. C., Lubarsky Decl., at ¶ 15; Exh. D., Declaration of Robert Friedman ("Friedman Decl."), which is incorporated herein by this reference, at ¶ 6). In a clinical setting, patients are given pre-treatment to reduce the pain, as well as amnestic drugs to ensure that the patient does not remember any pain. Here, there is no pre-treatment, and even assuming the etomidate lasts the entire execution, which Plaintiff does not concede that it will, the very last thing that Plaintiff will experience on this earth is pain.

38. While etomidate can be used to induce unconsciousness, because it has no analgesic properties, it is not suitable as a form of anesthesia as a single drug without additional pain relieving drugs.

39. Etomidate is not FDA-approved for use as the *sole drug* to produce anesthesia in minor surgical procedures. It is never used as a sole anesthetic in any procedure that involves significant noxious stimuli, as it has zero analgesic effect.

40. Regardless of any consciousness check, including a shake, shout, or pinch conducted following administration of etomidate, there is a substantial risk that Plaintiff will awaken from the undisputed noxious stimuli of the air hunger from the rocuronium and the injection of the caustic chemical potassium acetate.

41. Further compounding etomidate's inability to achieve and maintain unconsciousness for a long enough period of time is the use of the neuromuscular blocking agent rocuronium bromide. Following administration of this second drug, Mr. Davis would be unable to convey any feeling of pain or suffocation, and the paralysis would camouflage any attempted voluntary movement that might result from an incomplete loss of consciousness. (Exh. C., Lubarsky Decl., at ¶ 17, 18).

42. Florida prohibits the use of any neuromuscular blocking agent "for any purpose" during the euthanasia of dogs and cats.  Fl. Stat. 828.058(3).

43. Rocuronium bromide serves no legitimate purpose in the execution procedure and serves only to mask any pain and suffering the inmate may experience. In cases where etomidate is not successfully delivered and/or the condemned inmate is not adequately anesthetized, rocuronium bromide will create the appearance of a serene death while masking the fact that the condemned inmate is experiencing conscious paralysis, suffocation and the excruciating pain caused by the injection of potassium acetate.  Because the use of etomidate increases the risk that the inmate will not be remain anesthetized, the use of rocuronium bromide is more dangerous under the Etomidate Protocol than it was under prior Florida execution protocols.

44. Further, studies show that rocuronium and etomidate precipitate when mixed together, and this drug combination poses an additional risk that the drugs will clog the IV line, causing the line to fail in the middle of the execution procedure. (Exh. C., Lubarsky Decl. ¶27).

45. Mr. Davis is informed and believes, and on that basis alleges, that Defendants did not conduct a reasoned analysis to determine whether etomidate is a suitable anesthetic to prevent the inmate from suffering severe and substantial pain from the last two drugs.  Further, Defendants have chosen

a drug that causes significant pain upon injection.  As such, Defendants have been willfully indifferent to the substantial risk of inflicting severe pain on Mr. Davis.

**C. Executions in Florida Pursuant to the Etomidate Protocol and Florida's Alterations of Actual Execution Procedures Confirm That It Is Not Fit For Use As Part of An Execution Cocktail and That Florida Knows This.**

46. Over the past several years, Defendants have adopted measures to prevent witnesses from fully observing the condemned inmate during an execution. These incremental changes began in 2013, when Defendants started using midazolam, and continued through the four etomidate executions to date. During the execution of Mr. Darius Kimbrough on November 12, 2013, which was the first midazolam execution after the problematic execution of Mr. William Happ, Defendants covered Mr. Kimbrough from his shoulders to his feet with a white sheet.  The sheet was tented over his body, rather than draped, such that witnesses could not observe any movement made by Mr. Kimbrough.  (Exhibit E, Declaration of Richard Kiley ("Kiley Decl."), which is incorporated herein by this reference).  This was different from the previous executions where the sheet was draped over the inmate so that the witnesses could see the inmate's chest rising and falling during the execution.  (Exh. E, Kiley Decl., at ¶ 7).

-12-

47. Next, Defendants re-positioned the body of the prisoners, so that their feet are closest to the witnesses and their heads are farthest away, and Defendants started to tightly bandage the prisoners' hands, using a "giant mitten" to further obscure any subtle movements that could indicate consciousness. (Exhibit F, Declaration of Neal Dupree ("Dupree Decl."), which is incorporated herein by this reference at ¶11). Mr. Dupree also witnessed the 2006 execution of Angel Diaz, and described the differences between positioning of the prisoner: "Mr. Diaz was perpendicular to my position in the front row giving me an unobstructed view of his face, right side of his body, including the insertion site, and right hand, Mr. Lambrix was strapped to the gurney with his feet pointed directly towards me…Because of the distance I could not see the lethal drugs flowing through the tubing. Mr. Lambrix was covered by a sheet and his hands and fingers were completely covered up to his wrists with what appeared to be a giant mitten, making observation of his hands impossible. There was nothing completely covering Mr. Diaz's right hand during his execution leaving his hand partially observable for the witnesses." (Exh. F., Dupree Decl., ¶¶10, 11).

48. Despite Defendants' various attempts to prevent witnesses from fully observing inmates bodies throughout the execution, there is still evidence from half of the etomidate executions that the etomidate did not work as

intended. Specifically, during the execution of Patrick Hannon by Defendants on November 8, 2017, witnesses observed the inmate's chest heave and his arms, legs, and body convulse for approximately two minutes. (Exh. F., Dupree Decl., at ¶ 19).

49. During the execution of Eric Branch on February 22, 2018, he screamed, then thrashed and shook for 6 minutes following the administration of the etomidate. (Exh. D, Friedman Decl., at ¶ 6, 7).

50. Given the small sample size of executions in Florida using the Etomidate Protocol, the number of instances in which movement after the administration of etomidate has been observed is statistically significant and highly probative.

51. Lastly, a common side effect of etomidate is myoclonus, involuntary movements that can occur within minutes of the administration. For a lay person not extensively trained in assessing consciousness, these movements make it more difficult and time consuming to assess whether a person is actually unconscious and insensate.

52. Myoclonus is a particularly problematic side effect of etomidate in the context of Defendants' protocol because the team warden must determine whether the prisoner is unconscious before allowing the administration of the second and third drugs.

53. If there is a difficulty or delay in determining unconsciousness because of the myoclonic movements, either way, the Plaintiff will suffer. Because etomidate is so short acting, there is already a substantial risk of it wearing off before the execution is complete. Therefore, the longer it takes to assess consciousness, the greater the likelihood that the prisoner will awaken from the noxious stimuli of the second and third drugs. Additionally and alternatively, if the team warden mistakenly interprets the prisoner's movements as myoclonic, and misses signs of actual consciousness, the Plaintiff will suffer the excruciating pain of the second and third drugs.

54. Indeed, by selecting etomidate, Defendants have chosen a drug that makes the only constitutional safeguard in a three drug protocol – making sure the prisoner is unconscious – significantly more difficult for a lay observer. Whether their selection was a matter of ignorance or indifference to this fact is of no consequence.

**D. The Etomidate Protocol Is Constitutionally Flawed In Several Respects Other Than Its Use of Etomidate As the Anesthetizing Agent.**

55. As noted above, according to the Etomidate Protocol, the team warden ultimately will determine whether Mr. Davis is unconscious, but the protocol does not require that he be specifically and thoroughly trained to evaluate whether a person is adequately anesthetized. Moreover, the consciousness

assessment is performed immediately following the administration of the etomidate. This manner of assessing consciousness is completely ineffective and meaningless within the execution process. For a lethal injection execution to comport with the Eighth Amendment, the inmate must be in a surgical plane of anesthesia before the rocuronium bromide and potassium acetate are administered, and the inmate must remain deeply anesthetized until he is dead. For this reason, any assessment of anesthetic depth must be performed by a qualified and competent person who is able to monitor anesthetic depth in paralyzed patients.

56. The Etomidate Protocol also does not require an appropriate level of expertise or proficiency required for the personnel who perform the tasks involved in the lethal injection process. While it does set forth some minimum qualification requirements for the medical personnel, the Etomidate Protocol does not establish any minimum experience requirement, nor that the personnel perform their tasks as part of their regular employment. Moreover, there is no requirement that the personnel understand the particular requirements of a consciousness check when etomidate is being used. See Exhibit G, Declaration of Dr. Sneyd, incorporated herein by reference, at ¶14-20).

57. In the event that peripheral venous access is not possible, the written protocol allows for central venous line placement, with or without a venous cut-down (wherein a vein is exposed surgically and a cannula is inserted). Because central line placement is an invasive procedure that carries risks of immediate, life-threatening and painful complications, only a qualified and experienced medical professional, i.e. a physician, usually a surgeon with specialized training, can place a central line. The Etomidate Protocol lists the "classes of trained professionals" that will perform such a procedure if necessary. However, the list includes "an advanced registered nurse practitioner" and a "physician's assistant," neither of whom are qualified to place central lines. Allowing someone without proper training to place a central line with or without a venous cut-down would unreasonably cause unnecessary pain and suffering and create a substantial risk of serious harm.

58. There are no guidelines upon which the members of the execution team can rely if they are required to exercise their discretion during the process. The Etomidate Protocol has no plan in place if foreseeable problems arise during Mr. Davis's execution. Because the execution personnel are not adequately trained, they will be incapable of reacting effectively and quickly to foreseeable contingencies, thus increasing the danger that Mr. Davis will suffer needless pain. Specifically, there are no safeguards in place to deal

with the entirely foreseeable contingency of the etomidate wearing off during the execution and/or if the etomidate and rocuronium precipitate in the IV, clogging the lines.[1]

59. The absence of standardized procedures regarding purchase and administration of the execution drugs, the lack of adequate medical qualifications for the personnel involved in the process and the reliance on the three particular chemicals used in Florida, create a grave and substantial risk that Mr. Davis will be conscious throughout the execution process, and, as a result, will experience an excruciatingly painful and protracted death.

60. The Etomidate Protocol also does not allow for an adequate individualized assessment of Mr. Davis's specific medical conditions.  The dosage of the drugs remains the same regardless of the age, height and weight of the inmate. This is of particular concern in the Etomidate Protocol as compared to prior Florida execution protocols because etomidate is so marginally suitable for its intended use that small differences in these variables could have significant consequences.  While a medical examination is completed a week prior to the execution, there is no indication that Mr. Davis has a right to have his attorney present or to have an independent examination conducted by a physician of

_____

[1] There is a contingency for a second IV line, but no contingency if the drugs precipitate again in the second IV.

-18-

his choosing.  Defendants have also refused to allow the prisoner's attorney to view the IV insertion process to ensure that process is humane.  The Etomidate Protocol also fails to adequately explain how any issues relating to venous access will be resolved.  For example, there were noted problems achieving venous access in Mr. Kimbrough's execution, but nothing to indicate what those problems were, whether or not they were anticipated and what was done to resolve them.   See FDLE Logs, attached as Exhibit H.

61. Defendants' Etomidate Protocol fails to address the appropriate medical response to reasonably foreseeable complications.     Specifically, the Etomidate Protocol includes no safeguards that would protect Mr. Davis in the event a stay of execution is entered after the lethal injection process has begun or in the event that an unexpected medical contingency requires terminating the execution process.  At any time before the potassium acetate is administered, Mr. Davis could be readily resuscitated if trained personnel and routine resuscitation medication and equipment were present at the execution site.  Even after the potassium acetate is administered, resuscitation would still be possible, albeit more challenging.  Any resuscitation, however, would require the close proximity of the necessary equipment, medication and properly trained personnel.  The omission of such personnel and equipment under the protocol further undermines the constitutionality of the procedure.

**E. Florida's Execution Protocol is Also Unconstitutional Because It is a "Rolling Protocol" and Defendants Do Not Even Adhere to Their Own Requirements and Rules.**

62. Florida's execution process and procedures are also unconstitutional because Defendants fail to adhere to their own protocol, and make up and add steps ad hoc, without providing the inmate with adequate warning and notice.

63. By way of example only, during the execution of William Happ, Defendants failed to follow their protocol as written. Under the protocol as written, if the inmate is not unconscious after the first administration of midazolam, "the team warden shall signal that the execution process is suspended and note the time and order the window covering to the witness gallery to be closed." Etomidate Protocol, 12(5). The protocol further states that the secondary venous access site should be assessed and if viable, a second dose of etomidate is to be administered through the secondary site. If the secondary site is not viable, Defendants are to secure peripheral venous access or "perform a central line venous placement, with or without a venous-cut down, at one or more sites deemed appropriate by that team member." Etomidate Protocol, 12(5).

64. Once venous access is established, "the team warden shall order the drapes to be opened and signal that the execution process will resume." Etomidate

-20-

Protocol, 12(5). The executioners are then to administer the second round of lethal chemicals beginning with a second dose of etomidate and the team warden is to repeat the consciousness check.

65. In the executions of Mr. Happ and Mr. Hannon, even though there was movement after the consciousness check, the Defendants failed to follow their protocol and stop the execution to ensure unconsciousness before administering the second and third drugs.[2]

66. As another example, according to eye witnesses, during the execution of Mr. Davis, Defendants failed to follow their protocol with respect to the consciousness check. Moreover, the consciousness check is inconsistently performed even when it does occur.

67. Finally, Defendants have repositioned the prisoners to obscure the witnesses' views, and have repeatedly denied basic access and reasonable accommodations to prisoner's attorneys on the day of the execution. Offering no reason why, Defendants have rejected requests for an additional witness from the defense team, access to a telephone in case there is a problem during the execution, and refusal to allow the observation of the IV insertion process

---

[2] *See* Brendan Farrington, *Fla. Executes man for Illinois woman's 1986 murder*, Tampa Tribune (October 15, 2013) *available at* http://tbo.com/news/crime/happ-to-be-executed-today-for-1986-citrus-county-murder-20131015/ ; See Exhibit F, Declaration of Neal Dupree, ¶19.

– an integral part of the execution procedure that would give rise to an independent Eighth Amendment violation if difficulties arise.

68. For all the reasons set forth herein, the use of etomidate in Florida's new protocol constitutes a substantial change in protocol. First, unlike midazolam, etomidate causes significant pain upon injection. It is ultra-short acting and is likely to wear off before the execution is complete. One of its side effects is involuntary movement, which makes it more difficult to determine consciousness - the only safeguard in the archaic three drug protocol. Finally, this novel drug combination is likely to precipitate in the IV tubing, blocking the flow of chemicals.

## FIRST CLAIM FOR RELIEF

## VIOLATION OF RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT PURSUANT TO THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

69. Mr. Davis hereby incorporates by reference the allegations contained in paragraphs 1, 3-6, 9, 13-18, 20-68 and 73 - 80.

70. Defendants are acting under color of Florida law in administering to Mr. Davis chemicals that will cause unnecessary pain in the execution of a sentence of death, thereby depriving Mr. Davis of his rights under the Eighth and Fourteenth Amendments to be free from cruel and unusual punishment, in violation of 42 U.S.C. § 1983.

71. The use of etomidate – an ultra-short acting drug that causes significant pain upon injection, and that is not used by any other state in lethal injection protocol – raises a substantial risk of serious harm.  This risk is exacerbated by the use of an execution protocol that, in addition to the deficiencies described above, is subject to ad hoc, on-the spot modification without notice to the inmate, and by Defendants' consistent pattern of concealing their execution practices from public scrutiny and refusing attorney access and basic accommodations that are routinely granted in other states.  These deficiencies increase the risk that the execution of any particular inmate will be botched.

72. Independent of the foregoing, Defendants have violated the Eighth Amendment by failing to give reasoned consideration to alternative protocols, thereby consciously disregarding the known risk of unnecessarily inflicting severe pain on Mr. Davis.

## SECOND CLAIM FOR RELIEF

## DEFENDANTS' REFUSAL TO ADOPT A ONE-DRUG PROTOCOL VIOLATES THE EVOLVING STANDARDS OF DECENCY THAT MARK THE PROGRESS OF A MATURING SOCIETY ENCOMPASSED IN THE EIGHTH AMENDMENT.

73. Mr. Davis hereby incorporates by reference the allegations contained in paragraphs 1, 3-6, 9, 13-68, and 73-80.

74. Defendants are drastically out of step with the rest of the nation. Since January 2012, Florida has made several changes to its lethal injection protocol in order to maintain a three-drug protocol. During the same time period, many death penalty states have affirmatively abandoned use of paralytic drugs and potassium.

75. Since the beginning of 2015, there have been 75 executions in nine states. Well over half (53) used a single dose of pentobarbital to cause death. Of the remaining 22, one utilized a three-drug protocol with pentobarbital as the first drug, 17 utilized a three-drug protocol with midazolam as the first drug[3]. Florida is responsible for the remaining four three-drug protocol executions, using etomidate as the first drug. Further, in 2018, Florida is the only state to have carried out an execution using a paralytic in their protocol.

76. Florida's continued adherence to a three-drug protocol violates the evolving standards of decency that mark the progress of a maturing society as encompassed by the Eighth Amendment. While Mr. Davis believes that he should not have the burden of presenting an alternative method of execution, as demonstrated by a review of other states that have modified their lethal injection procedures post-*Baze*, feasible, readily-implemented alternative

---

[3] Four of those executions came from Arkansas, who attempted to execute eight prisoners in 10 days before the expiration of their midazolam in 2017. Four executions were ultimately carried out.

-24-

procedures exist that would significantly reduce the substantial risk of excruciating pain created by Florida's deficient protocol.

77. These alternative procedures include, but are not limited to, a protocol that remedies the deficiencies set forth herein and does not use a three-drug protocol where the second drug is a paralytic, as for example an appropriate protocol based upon the administration of a single dose of a barbiturate.

78. Plaintiff, in keeping with the requirements set forth in *Glossip*, and specifically preserving his objection that those requirements are contrary to the dictates of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States - hereby identifies a single dose of non-compounded or properly compounded pentobarbital as the readily available alternative to the State of Florida's current unconstitutional protocol. Plaintiff maintains that in order for this proposed alternative to pass constitutional muster, any compounded pentobarbital must at the very least be subject to routine testing, the results of which are timely provided to defense counsel, in order to ensure that the drug is pure and uncontaminated. The process by which the compounded pentobarbital is obtained must also be transparent, including disclosure of the source of the Active Pharmaceutical Ingredient (API), again in order to ensure that the drug is pure and uncontaminated.

79. As noted above, three other states, Texas, Missouri and Georgia, have executed a combined 53 prisoners since 2015 using this method. Moreover, California and Kentucky have recently proposed one-drug protocols, further demonstrating the national consensus towards the availability and feasibility of this alternative method.

80. Evolving standards of decency forbid States from executing inmates by the use of a three-drug cocktail where the second is a paralytic because the inclusion of such a drug serves no purpose but to make the experience more pleasant for the onlookers, while enabling the State to conceal its own potentially unconstitutional conduct.

## REQUEST FOR RELIEF

WHEREFORE, Mr. Davis respectfully requests that this Court:

(a) Permanently enjoin the Defendants from executing Mr. Davis by means of lethal injection in accordance with their existing procedures and protocols;

(b) Issue a declaration that the Defendants' existing lethal injection protocols and procedures violate the United States Constitution;

(c) To the extent it may determine that Mr. Davis is not entitled to judgment as a matter of law, grant him an evidentiary hearing and grant such other and further relief as this Court may deem just and warranted;

(d) To the extent it may deem the factual allegations incorporated into any count hereof insufficient to sustain that count, incorporate therein such other paragraphs of this complaint as may render it sufficient.

Respectfully submitted,

**s/Maria DeLiberato**
Maria DeLiberato
Florida Bar No. 664251
Assistant Capital Collateral Counsel
Email: Deliberato@ccmr.state.fl.us
Secondary email: support@ccmr.state.fl.us

**s/Raheela Ahmed**
Raheela Ahmed
Florida Bar No. 0713457
Assistant Capital Collateral Counsel
Email: ahmed@ccmr.state.fl.us
Secondary email: support@ccmr.state.fl.us

**s/Maria Christine Perinetti**
Maria Perinetti
Florida Bar No. 13837
Assistant Capital Collateral Counsel
Email: perinetti@ccmr.state.fl.us
Secondary email: support@ccmr.state.fl.us

**s/Julissa Fontan**
Julissa Fontan
Florida Bar No. 32744
Assistant Capital Collateral Counsel
Email: fontan@ccmr.state.fl.us
Secondary Email: support@ccmr.state.fl.us

**s/Chelsea Shirley**
Chelsea Shirley
Florida Bar No. 112901
Assistant Capital Collateral Counsel

Email: shirley@ccmr.state.fl.us
Secondary Email: support@ccmr.state.fl.us
Capital Collateral Regional Counsel - Middle
12973 N. Telecom Parkway
Temple Terrace, FL 33637
813-558-1600

*Attorneys for Plaintiff*